**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**TOBIAS ELIZONDO-SEDILLO,**

     **Plaintiff,**

**vs.**                                                                                   **No. 14 CV 127 JAP/LAM**

**CITY OF ALBUQUERQUE,**
**OFFICER ANDREW DOMINGUEZ,**
**OFFICER GABRIEL MONTOYA,**
**OFFICER CEDRIC GALLOW,**
**and**
**OFFICER MICHAEL MCDANIEL,**

     **Defendants.**

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANT'S *DAUBERT* MOTION REQUESTING TO**
**EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT THOMAS MCGRANE**

On November 10, 2014, Defendant City of Albuquerque (City) filed DEFENDANT'S *DAUBERT* MOTION, AND MEMORANDUM IN SUPPORT, REQUESTING TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT THOMAS MCGRANE (Doc. No. 59) (the Motion). In response, Plaintiff Tobias Elizondo-Sedillo (Plaintiff) filed PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF THOMAS McGRANE (Doc. No. 60) (Response). On December 3, 2014, the City filed DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S *DAUBERT* MOTION AND MEMORANDUM IN SUPPORT, REQUESTING TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT THOMAS MCGRANE (Doc. No. 61) (Reply).

Because the Court finds that Thomas McGrane (McGrane) is qualified to testify as an expert on handcuffing procedures and that some of his opinion testimony will help the jury decide this case, the Court will grant the Motion in part and deny the Motion in part.

1

I. STANDARD OF REVIEW

Under Federal Rule of Evidence 702 courts have a special gatekeeping role to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrill-Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc). To fulfill this burden, the proponent must convince the court that the expert's specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue in the case. *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012). The court's decision involves "a common sense inquiry [into] whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." *United States v. Muldrow*, 19 F.3d 1332, 1338 (10th Cir. 1994).

After the court determines that the expert's opinion will help the jury, the court must perform a two-step analysis. First, the court must conclude that "the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Nacchio*, 555 F.3d at 1241. Second, the court must examine the expert's opinion to decide whether the opinion is reliable by assessing the underlying reasoning and methodology. *Avitia-Guillen*, 680 F.3d at

1256. In addition to the Rule 702 determination, the court must decide whether all or part of the expert's opinion should be excluded because its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the jury, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## II. BACKGROUND[1]

A. *Plaintiff's Arrest*

On June 16, 2012, at approximately 2:16 a.m., Albuquerque Police Department (APD) Officer Matthew Reeder arrested Plaintiff for disorderly conduct. Officer Reeder handcuffed and escorted Plaintiff to a prisoner transport van operated by APD Prisoner Transport Officers Andrew Dominguez and Gabriel Montoya. Before transporting Plaintiff, Officer Dominguez removed Officer Reeder's handcuffs and re-handcuffed Plaintiff using his own set of handcuffs. Officers Dominquez and Montoya transported Plaintiff to the Prisoner Transport Center (PTC) located in downtown Albuquerque.

Sometime after Plaintiff arrived at the PTC, he was brought to the processing desk where the handcuffs were removed, and Plaintiff was instructed to remove his rings. Plaintiff was then re-handcuffed and put into a holding cell. Plaintiff alleges that the officer who re-handcuffed him neglected to double lock the handcuffs to ensure they did not become too tight around Plaintiff's wrists. Plaintiff claims that when he sat down in the holding cell, his handcuffs became so tight that they pinched his wrists causing numbness and pain. Despite Plaintiff's numerous and vociferous complaints about the painfully tight handcuffs, officers at the PTC ignored Plaintiff's complaints over the course of Plaintiff's three-hour detention.

---

[1] On August 15, 2014, the Court granted in part and denied in part a motion to dismiss and for summary judgment filed by the City and by individual officers Andrew Dominguez, Gabriel Montoya, Michael McDaniel, and Cedric Galloway. The Court dismissed all claims against the individual Defendant officers but denied the motion as to Plaintiff's claims against the City. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 45). The background facts are taken primarily from that MEMORANDUM OPINION AND ORDER.

It is the City's policy to leave detainees handcuffed in the PTC holding cells. The City admits that PTC detainees often complain about handcuffs being too tight. According to PTC Sergeant Jaramillo, the supervisory sergeant at the PTC on June16, 2012, there was no protocol for responding to complaints about handcuffs. In his deposition, Sergeant Jaramillo explained that responding to handcuff complaints was a PTC officer's personal call; if an officer wants to check the handcuffs, he can, but he does not have to check them. Sergeant Jaramillo testified that there was no oversight or review of an officer's decision to ignore a detainee's complaints. This had been the practice for several years prior to Plaintiff's arrest. (*See* Doc. No. 43-1 Jaramillo Dep.)

Around 5:20 a.m., PTC Officers Michael McDaniel and Cedric Galloway drove Plaintiff to the Metropolitan Detention Center (MDC) located several miles from the PTC. The PTC officers who escorted Plaintiff from the PTC holding cell to the transport van also ignored Plaintiff's complaints about his handcuffs. Those officers grabbed Plaintiff by the handcuffs to lift him into the van because Plaintiff could not step up into the van with shackles on his ankles. This caused Plaintiff increased excruciating pain.

On June 22, 2012, six days after his arrest, Plaintiff was treated at an emergency room for wrist pain due to "right ulnar nerve neuropathy secondary to trauma from to [sic] tight handcuffs." Medical Report Ex. C to Resp. to Mot. Summ. J. (Doc. No. 32-3).

B. *Plaintiff's Claims*

The Court has dismissed Plaintiff's claims against the individual PTC officers because Plaintiff could not identify the PTC desk officers who re-handcuffed him and ignored his complaints.[2] Thus, there are only two claims against the City set for trial: 1) Plaintiff's 42 U.S.C. § 1983 claim against the City for the PTC officers' use of excessive force in violation of the Fourth Amendment; and 2) Plaintiff's state law claim that the City is vicariously liable for the PTC officers' use of excessive force resulting in injury to Plaintiff's wrists. *See generally Monell v. Dep't of Social Servs. of City of New York,* 436 U.S. 658, 691 (1978) (holding that cities may not be vicariously liable for employees' constitutional violations but can be liable for constitutional deprivations stemming from a governmental custom); *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't,* 121 N.M. 646, 651 (1996) (stating that police departments may be held vicariously liable for any torts, such as assault and battery, committed by police officers for which immunity has been waived under the New Mexico Tort Claims Act).

C. *Legal Standard Applied to Tight Handcuffing Under Federal Law*

The Fourth Amendment protects individuals from "unreasonable . . . seizures." U.S. CONST. amend. IV. Courts have long recognized that the reasonableness of a seizure by arrest depends not just on why or when an arrest is made, but also *on how* the arrest is accomplished. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Supreme Court has stated that a small amount of force, such as an arrest where one is handcuffed, placed in a police vehicle, and taken to the police station, although inconvenient and embarrassing, does not rise to the level of excessive force. *Atwater v. City of Lago Vista,* 532 U.S. 318, 354–55 (2001). However, "[i]n some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely

---

[2] Plaintiff did not ask for further discovery under Fed. R. Civ. P. 56(d).

complaints (or was otherwise made aware) that the handcuffs were too tight." *Cortez v. McCauley,* 478 F.3d 1108, 1129 (10th Cir. 2007). A plaintiff claiming he was subjected to excessive force due to improper handcuffing must show "some actual injury" caused by the handcuffing "that is not de minimis." *Id.* at 1127 n. 25. For example, in *Vondrak v. City of Las Cruces*, the Tenth Circuit upheld the denial of qualified immunity to arresting officers based on evidence that an arrestee complained several times about tight handcuffs and suffered nerve damage to his wrists. 535 F.3d 1198, 1209 (10th Cir. 2008).

D. *Legal Standard for Municipal Liability*

In Plaintiff's FIRST AMENDED COMPLAINT FOR MONEY DAMAGES FOR PERSONAL INJURY AND FOR PUNITIVE DAMAGES (Amended Complaint) (Doc. No. 20), Plaintiff alleges that the City "had knowledge of, condoned, and took no steps to correct [its] policies, practices and/or customs of the use of excessive force against citizens by the Defendant Transport Officers." (*Id.*¶ 24.) The City "could have or should have reasonably foreseen the injuries alleged herein as a consequence of said policies, practices or customs." (*Id.*) "The inadequacy of the training provided employees of the City of Albuquerque amounted to the deliberate indifference to the rights of citizens with whom they come into contact with on a regular basis. The failure of the Defendants to train their employees and subordinates not to use excessive force resulted in [Plaintiff's] constitutional rights being violated." (*Id.*¶ 32.)

A plaintiff suing a municipality under Section 1983 for the acts of its employees must prove: (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional violation. *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010) (upholding district court's conclusion that unwritten Taser policy was the moving force behind the officer's improper use of a Taser

that injured the plaintiff). A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may result. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotations and citations omitted).  From the allegations in Plaintiff's Amended Complaint, it appears that Plaintiff seeks to hold the City liable for an informal custom allowing officers to ignore complaints of tight handcuffs or for the failure to adequately train or supervise PTC officers in their actions toward PTC detainees with deliberate indifference to the injuries those actions may cause. *Id.*

"[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388 (1989). In general, where a plaintiff sues a municipality for failure to adequately train or supervise its employees, the plaintiff must show that a need for more or different training or supervision is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train or supervise can fairly be said to represent official policy. *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (citing *City of Canton*, 489 U.S. at 389).  In

*Allen v. Muskogee,* 119 F.3d 837, 841 (10th Cir.1997), the court outlined a four-part test for

municipal liability for failure to train:

> [A] plaintiff must show (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Id.* at 841–42.

In sum, to prove his federal claim against the City, Plaintiff must first show that the PTC

officers acted unreasonably by failing to double lock the handcuffs and by failing to respond to

Plaintiff's complaints about tight handcuffs during Plaintiff's three-hour detention. Second,

Plaintiff must show that a City custom or policy was the moving force behind the PTC officers'

actions (or inactions). *Cavanaugh*, 625 F.3d at 667. Plaintiff can prove a custom or policy by

showing that the City failed to adequately train or supervise the PTC officers in proper

handcuffing procedure or in proper response to complaints about tight handcuffs. *Allen*, 119 F.3d

at 841-42. Plaintiff must also show that the need for more or different training or supervision was

so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to

train or supervise can fairly be said to represent official policy. *Id.* To prove his claims against

the City, Plaintiff proffers the opinion testimony and report of Thomas McGrane as an expert on

police procedures and proper handcuffing techniques.

E.  *McGrane's Qualifications*

After military service of 21 years, McGrane worked as a security police officer for the

Department of Energy (DOE) at Los Alamos National Laboratories (LANL) from August 1988

to October 2009. (Mot. Ex. A.) At LANL, McGrane was assigned to a Special Response Team

responsible for tactical response and tactical crises resolution. *Id.* In addition, McGrane worked

as body guard for former United States Senator Pete Domenici and for delegates from Russia during their visits to LANL. (*Id.*) From August 2010 to the present, McGrane has been a Contract Investigator for Keypoint Solutions and has successfully processed background investigations for the FBI and DOE. (*Id.*)

In an affidavit submitted with the Response, McGrane described his training and experience as a Special Response Team officer at LANL. McGrane had the authority to arrest without a warrant and was annually trained and certified in arrest procedures and handcuff protocols. (Resp. Ex. A ¶¶ 1-3.) As a Special Response Team officer, McGrane acquired "technical specialized knowledge of handcuffing protocols gleaned from 23 years of certification and re certification in arrest procedures. . . ." (*Id.* ¶ 7.) McGrane received training in "nationally accepted standards for handcuff protocols . . . [that] are taught at officer training academies throughout the United States." (*Id.* ¶ 9.) McGrane was trained at the Mason & Hangar Training Academy and the United States Department of Energy Training Academy. (*Id.*)

F. *McGrane's Conclusions: Written Report*

In his written report (Mot. Ex. B), McGrane outlines his conclusions:

(1) "Medical reports support the Plaintiff's claim of injuries suffered to both wrists. The injuries sustained were still in the process of healing six days after the Plaintiff was arrested. In my opinion, these injuries were most likely sustained after the Plaintiff was transferred into the custody of either Detention Center or Prisoner Transport personnel."

(2) "The initial arrest by Officer Matthew Reeder was properly conducted and followed nationally-accepted procedures and standards of arrest."

(3) "The leg shackles that were applied to the Plaintiff could have temporarily been removed in order to facilitate the ability of the Plaintiff to step up and enter into the transport van, thus eliminating the need for Transport Officers to lift the Plaintiff by his handcuffed arms."

(4) "During the period of time when the Plaintiff was in the custody of Detention Center and Prisoner Transport personnel, the handcuffs were not double-locked, and that failure to double-lock the handcuffs was directly responsible for the injuries sustained by the Plaintiff."

(5) "When handcuffs are not double-locked, they have a natural tendency to tighten when the arrestee, who is normally in a sitting position, has his handcuffed wrists pressed between his own body and the back of the seat which he/she is sitting in."

(6) "Certain personnel were derelict in their duties and responsibilities and that [sic] their inattention, whether willful or accidental, directly contributed to the injuries sustained by the Plaintiff."

(7) "No prisoner should be willfully or accidentally neglected to the point of suffering extreme physical discomfort while remaining in handcuffs for three or more hours."

(Mot. Ex. B.)[3]

G. *McGrane's Opinions: Affidavit*

In his affidavit, McGrane states:

(1) "[T]he handcuffing protocols in this case were not complied with. I reviewed the DVD of the initial arrest, lapel camera footage, video and audio of the plaintiff being turned over to the transport officer, plaintiff's affidavit which demonstrated the duration of the incident

---

[3] McGrane also expressed opinions on whether Plaintiff was treated unreasonably when officers refused his numerous requests to use the restroom, which led to Plaintiff defecating in his pants. This claim against the City has been dismissed. MEMORANDUM OPINION (Doc. No. 45) at p. 15 (concluding that Plaintiff failed to link this constitutional injury to a City policy or custom).

lasting several hours, medical reports from the VA, and copies of arrest reports." (Resp. Ex. A ¶ 8.);

(2) "While I am not an MD, I was certified in lifesaving first aid measures as required as a DOE contract officer. I recertified annually up to 2009 when I retired. I know from this training that tight handcuffs work the same way a tourniquet works to stop blood flow. Just as a tourniquet can cut off blood flow to an extremity, so can a handcuff, which can result in injury. I have reviewed plaintiff's medical records from the VA, as well as a recent Medic Wiki article on handcuff neuropathy, and found them to be consistent, such that I can opine, that medical records indicating that plaintiff's injuries were the result of too tight handcuffs, are likely accurate." (*Id.* ¶ 11.)

(3) "I am qualified to opine the cuffs were not double locked at some point after the initial arrest, because the plaintiff had no complaint with handcuffs during the time he was in custody by the initial arresting officer. Double locking is essential to prevent the types of injuries sustained by plaintiff, as determined and recorded by his doctors in his medical records furnished to me." (*Id.* ¶ 12.)

(4) "I relied on more than the Plaintiff's version of events in making my opinions. I relied on a VA report . . . showing right ulnar nerve neuropathy secondary to trauma from too tight handcuffs. Additionally, I reviewed radiology reports and records dated 6/22/2012, showing possible mild soft tissue swelling in the wrists bilaterally, taken just days after the arrest." (*Id.* ¶ 15.)

H. *Documents McGrane Reviewed*

In forming his opinion, McGrane reviewed:

(1) Plaintiff's Complaint dated November 27, 2013 (Doc. No. 1-1);[4]

(2) Letter to the City, Attention: Tommy Valdez, Senior Adjuster, dated April 12, 2013;

(3) Letter from the City to the Whitener law firm dated August 13, 2012;

(4) Albuquerque Police Department Police Report dated June 16, 2012;

(5) Albuquerque Police Department Transport Unit Prisoner Movement Log dated June 16, 2012;

(6) New Mexico HCS, Radiology Reports, Consult Requests, and Progress Notes dated August 13, 2012;

(7) Letter from Vogel, Ellis & Bennett Attorneys at Law dated March 4, 2014;

(8) Affidavit of Albuquerque Police Officer Matthew Reeder dated February 26, 2014;

(9) In-person interview notes, Tobias Elizondo-Sedillo, dated March 7, 2014;

(10) DVD of the initial arrest, lapel camera footage, and audio/video of the Plaintiff's transfer to the transport officer; and

(11) Plaintiff's affidavit.

## III. DISCUSSION

### A. McGrane's Qualifications in Resume and Affidavit

The City argues that McGrane's resume reveals he is not qualified to testify on proper handcuffing because he has never worked for a law enforcement agency or jail, he has never arrested or handcuffed anyone, he has no training in police tactics or use of force, and he has never worked at a jail or prisoner transport unit. McGrane's resume does not outline any experience with handcuffing or arrest procedures. McGrane's resume generally describes that as a Security Police Officer/SPO II & III, McGrane became "[k]nowledgeable in all tactical

---

[4] On March 14, 2014 Plaintiff filed a FIRST AMENDED COMPLAINT FOR MONEY DAMAGES FOR PERSONAL INJURY AND FOR PUNITIVE DAMAGES (Doc. No. 20) to include additional claims and to add the PTC officers as defendants.

response options. . . . [c]apable of maintaining Tactical Operations Center/TOC functions[.]"
(Mot. Ex. A at 2.) However, McGrane's affidavit, attached to Plaintiff's Response, elaborates on
McGrane's training as a Special Response Police Officer: "In that position I was trained and
repeatedly certified in arrest procedures generally and handcuff protocols specifically." (Resp.
Ex. A ¶ 3.) "I possess technical specialized knowledge of handcuffing protocols gleaned from 23
years of certification and re certification in arrest procedures . . ." (*Id.* ¶ 7.)

In its Reply, the City argues that McGrane's affidavit attached to Plaintiff's Response
should be stricken under Fed. R. Civ. P. 37(c) because the information regarding McGrane's
training and certification was not disclosed in Plaintiff's initial Rule 26 disclosures. *See* Fed. R.
Civ. P. 26 (a)(2) (requiring expert witness disclosures); Fed. R. Civ. P. 37(c) (allowing court to
strike information not disclosed under Rule 26(a) or (e)). However, in Plaintiff's Rule 26
disclosures (Doc. No. 39), Plaintiff submitted a slightly different affidavit from McGrane in
addition to McGrane's resume. In that affidavit, McGrane stated he "participated in handcuff
training and was certified in the use of handcuffs on a biannual basis from 1986 to 2009." (Doc.
No. 39 Ex. 2.) Hence, McGrane's handcuff training and certification were properly and timely
disclosed, and there is no reason to strike McGrane's latest affidavit. The City has known about
McGrane's handcuff and arrest training and certification since May 13, 2014, when the initial
expert disclosures were filed.

The City further asserts that McGrane has no medical education or training and is not
qualified to review and interpret the medical records from the New Mexico HCS. Plaintiff
counters that he will offer the testimony of his treating physicians to prove he suffers wrist
neuropathy and that he will present McGrane's opinion to corroborate the conclusion from the
medical records that Plaintiff's injuries were caused by tight handcuffs.

13

The Court finds, based on McGrane's resume and affidavit, that McGrane is qualified through training and experience to testify that proper handcuff procedures include double locking, that handcuffs have the propensity to tighten when they are not double locked, and that tight handcuffs can cause injuries. In his affidavit, McGrane also asserts he is familiar with national handcuff safety standards, and he may testify about those standards. However, McGrane is not qualified to interpret or offer an opinion regarding the accuracy of the conclusions in Plaintiff's medical records.

B. *McGrane's Findings*

In the first section of his opinion, McGrane makes several "FINDINGS." (Mot. Ex. B). The City argues that statements in these FINDINGS are factually disputed, internally inconsistent, or at odds with Plaintiff's initial Complaint. McGrane's first FINDING states in relevant part,

> A review of the affidavit of Albuquerque Police Officer Matthew Reeder, the initial arresting officer . . . indicates that Officer Reeder followed nationally standardized handcuffing techniques, indicating that he had placed his "finger in between the handcuffs and [Plaintiff's] wrists to make sure there was enough spacing between the handcuffs and the wrists." Furthermore, Officer Reeder "also checked to make sure that the hancuffs [sic] were double-locked so that they would not clamp down on his wrists." . . . Upon arrival at the prisoner-transport van, Officer Reeder transferred custody of the Plaintiff "to a Prisoner Transport Officer." During this transfer of custody, further testimony reflects that Officer Reeder followed nationally standardized arrest procedures wherein Plaintiff was briefly double-handcuffed, in order to facilitate the removal and retention of Officer Reeder's personal handcuffs. At the time of transfer-of –custody, Officer Reeder stated that he "did not notice any apparent injuries" on the Plaintiff, that the Plaintiff "did not complain of any injuries", and the Plaintiff "did not ask to use the restroom or appear to have defecated on himself." Officer Reeder's sworn testimony in AFFIDAVIT OF MATTHEW REEDER, dated 26 February 2014, corroborates the Albuquerque Police Department Police Report #120055821, dated 06/16/2012, time 2:16 AM, wherein it states that the Plaintiff was transported to the Metropolitan Detention Center downtown "without incident".
>
> After Officer Reeder's handcuffs had been removed from the Plaintiff, the Prisoner Transport Officer subsequently became responsible for the inherent duty to re-assess and reset the Metropolitan Detention Center's handcuffs which had just been placed on the

Plaintiff by the Prisoner Transport Officer. There is no specific evidence or testimony which ensures or demonstrates that the Prisoner Transport Officer re-assessed and reset the handcuffs, after having taken over the physical control of and responsibility for the Plaintiff. The Albuquerque Police Department Transport Unit Prisoner Movement Log indicates that On-Duty-Sergeant Jaramillo commenced custody of the Plaintiff on 06/16/2012, time 03:47 AM and the Transport Officers Galloway and McDaniel commenced custody of the Plaintiff at the reported time of transport on 06/16/2012, time 05:20 AM, at which time the Plaintiff was transported to the West Side Albuquerque Metropolitan Detention Center [MDC] where the Plaintiff was kept in custody for seven days. During this transport, the Plaintiff stated that both handcuffs and leg-shackles were utilized. When the Plaintiff could not step up into the transport van, the Plaintiff was lifted up into the van by at least two Transport Officers who reportedly lifted up the Plaintiff by his handcuffed arms.

(Mot. Ex. B) (quotation marks in original).

In his second FINDING, McGrane states

Review of the medical report that was generated by New Mexico HCS, after the Plaintiff visited the emergency room on 06/22/2012, indicates the following clinical finding: Six days after the Plaintiff was arrested, there still remained visible evidence of "skin abrasion, right ulnar nerve neuropathy secondary to trauma from too tight handcuffs." The Plaintiff stated to medical personnel that he "was lifted from the cuffs" and that "the cuffs were so tight that his hands were swollen after the hand-cuffs were removed." In the medical report medical personnel state that, six days after the Plaintiff was arrested "wrists have abrasions as noted" and that the abrasions are "healing with dry scabs present."

The City takes issue with the finding that Officer Reeder did not notice injuries to Plaintiff's wrists because this finding directly contradicts Plaintiff's initial Complaint (Doc. No. 1-1) accusing Officer Reeder of improperly handcuffing him. (Mot. at 6.) However, in Plaintiff's Amended Complaint, he omitted the allegation that Officer Reeder improperly handcuffed him. (*See* Doc. No. 20 ¶ 9.) The City further notes McGrane failed to mention Plaintiff's retraction in the Amended Complaint. The City attempts to discredit Plaintiff by pointing out that Plaintiff corrected his initial complaint after Plaintiff reviewed Officer Reeder's affidavit and lapel video. This argument is a back door attack on Plaintiff's credibility and does not support excluding

15

McGrane's opinion testimony. Moreover, the City may cross examine McGrane on this discrepancy, if necessary.

Next, the City argues that McGrane's report contradicts Officer Reeder's affidavit and the APD police report. In McGrane's report he quotes the APD report, "Plaintiff was transported to the **Metropolitan Detention Center downtown** 'without incident.'" (Mot.  Ex. B) (emphasis added). The City interprets this as an admission that Plaintiff was transported to the MDC, Plaintiff's destination after his detention at the PTC, without incident. According to the City, this means Plaintiff admits that nothing improper happened while Plaintiff was held at the PTC. In other words, the City uses this statement to support a finding that City personnel at the PTC did not injure or mistreat Plaintiff because Plaintiff arrived at his final destination "without incident."

It appears that McGrane and the APD police report identified the PTC as "MDC downtown." Consequently, this statement is not an admission that no mistreatment occurred at the PTC. Moreover, McGrane's recognition that Plaintiff was transported to the MDC downtown (PTC) without incident seems not to be disputed. Based on McGrane's opinion, Plaintiff's injury resulted from the actions of the PTC officers after Plaintiff was transferred into their custody, not from conduct of the initial arresting officer.

The City points out another error in McGrane's findings:

> After Officer Reeder's handcuffs had been removed from the Plaintiff, the Prisoner Transport Officer subsequently became responsible for the inherent duty to re-assess and reset the **Metropolitan Detention Center's handcuffs** which had just been placed on the Plaintiff by the Prisoner Transport Officer.

Mot. Ex. B at p. 2 (emphasis added).

The City argues that McGrane's reference to the "Metropolitan Detention Center's handcuffs" is noteworthy because the MDC, the place where Plaintiff was transported after the PTC, is a County facility, not a City facility. The City contends that if McGrane thinks that the

handcuffs truly belonged to the MDC, then the City should be excused from liability. This criticism of McGrane's findings simply extrapolates from McGrane's confusion as to the name, location, and function of the PTC and the MDC. Moreover, McGrane did not factor the ownership of the handcuffs into his analysis. McGrane opined that it was the PTC officers, not the initial arresting officer, who improperly placed the handcuffs on Plaintiff's wrists. The City's liability, if any, will be based on the actions of the PTC officers, not on the City's ownership of the handcuffs.

The City cites another mistake in McGrane's statement that "[t]here is no specific evidence or testimony which ensures or demonstrates that the Prisoner Transport Officer re-assessed and reset the handcuffs after having taken over the physical control and responsibility for the Plaintiff." The City maintains that this statement is contradicted by the affidavit testimony of Andrew Dominquez that he "used standard handcuffing techniques to handcuff both wrists during which I placed my finger in between the handcuffs and [Plaintiff's] wrists to make sure there was enough spacing between the handcuffs and the wrists." (*See* Doc. No. 24-5 ¶ 6.)

In his findings, McGrane recited Plaintiff's version of the facts describing his transport from the PTC to the MDC on the West side of Albuquerque: ". . . Plaintiff stated that both handcuffs and leg-shackles were utilized. When the Plaintiff could not step up into the transport van, the Plaintiff was lifted up into the van by at least two Transport Officers who reportedly lifted up the Plaintiff by his handcuffed arms." The City disputes this version of the facts and points to the testimony of Officer McDaniel and Officer Galloway that leg shackles were never used on Plaintiff.

Finally, the City attacks McGrane's contention that he reviewed the "medical report that was generated by New Mexico HCS, after the Plaintiff visited the emergency room on

06/22/2012" because McGrane failed to mention information from a radiology report included in those records. The radiology report stated that there was no fracture to either of Plaintiff's wrists and there was no "osseous abnormality in either wrist." (*See* Doc. No. 24-9.)

To summarize, the City argues that McGrane improperly failed to examine all of the evidence and accepted Plaintiff's version of events without giving due weight to the PTC officers' testimony and some of the information in the medical reports. All of these factual statements, whether erroneous or incomplete, can be addressed on cross examination and are not sufficient to exclude McGrane's opinion testimony. The City's arguments about factual errors go to the weight, not the admissibility, of McGrane's testimony. *See Ortega v. City and County of Denver*, No. 11 CV 2394, 2013 WL 438579 * 5 (D. Colo. Feb. 5, 2014) (unreported) (noting that most of the defendants' arguments against admitting an expert's opinion were related to the weight, not the admissibility of the opinion and that defendants could cross examine the expert "about the basis for his opinions and the conclusions he draws therefrom.").

C. *McGrane's Conclusions*

1. *Medical Reports and Timing of Plaintiff's Injuries*

The City asserts that McGrane is unqualified to present his first conclusion that "medical reports support Plaintiff's claim of injuries suffered to both wrists" because McGrane is not qualified to interpret medical reports. In addition, the City argues that McGrane relies on medical reports to improperly speculate as to when Plaintiff was injured: "The injuries sustained were still in the process of healing six days after the Plaintiff was arrested. In my opinion, these injuries were most likely sustained after Plaintiff was transferred into the custody of either Detention Center or Prisoner Transport personnel." (Mot. Ex. B at 3.) In his affidavit, McGrane clarifies, ". . . the cuffs were not double locked at some point after the initial arrest, because the

plaintiff had no complaint with handcuffs during the time he was in custody by the initial arresting officer. Double locking is essential to prevent the types of injuries sustained by plaintiff, as determined and recorded by his doctors in his medical records furnished to me." (Resp. Ex. A ¶ 12.) Plaintiff counters that McGrane admits he is no medical doctor and that the best testimony on medical issues will come from Plaintiff's treating physicians.

The Court agrees that the physicians who treated Plaintiff's injury are the best source from which the jury can evaluate whether Plaintiff suffered more than a de minimis injury. Since McGrane has no medical education or experience, the Court will not allow McGrane to testify that the medical reports "support the Plaintiff's claim of injuries suffered to both wrists." It appears that McGrane, in his first conclusion, is concluding from the mere fact of Plaintiff's injury that the injury occurred after Plaintiff was handed over to the PTC officers. McGrane fails to explain how he arrived at this conclusion other than Plaintiff's lack of complaint when he was brought to the PTC van. McGrane's opinion on the timing of Plaintiff's injury is speculative, and the Court will exclude McGrane's first conclusion entirely. The timing of Plaintiff's injury is best left to the jury as the fact finder. *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (". . . an expert witness's testimony may not usurp the jury's fact-finding function.").

### 2. *Initial Arrest*

McGrane's second conclusion is that the initial arrest by Officer Reeder was properly conducted and followed nationally accepted procedures. Under recent Tenth Circuit precedent, evidence of nationally accepted police practices is not relevant to show that an individual officer complied with the Fourth Amendment. *Tanberg v. Sholtis*, 401 F.3d 1151, 1163 (10th Cir. 2005); *Vondrak v. City of Las Cruces*, No. 05 CV 0172, 2014 WL 3241555, * 12 (D.N.M. Aug. 25, 2009). However, as discussed *infra*, evidence of nationally accepted practices may be relevant to

show that a municipality's custom or policy falls below accepted standards. Significantly, McGrane fails to describe how he determined the propriety of the arrest. And, McGrane's opinion on this matter may be unnecessary if this fact is undisputed. If, however, this fact is disputed, Plaintiff will need to provide a foundation for McGrane's opinion before the Court will allow it. As it stands currently, McGrane's second conclusion is inadmissible.

### 3. *Leg Shackles*

McGrane's third conclusion states that the leg shackles should have been removed from Plaintiff's ankles in order to allow Plaintiff to step up into the transport van thereby eliminating the need for the transport officers to lift the Plaintiff by his handcuffed arms. This is a fact question for the jury to decide, and the jury is capable, without an expert, to decide whether this should have been done. *See Navarette v. Wiebe*, No. Civ. 13-708, 2014 WL 4716087, *2 (W.D. Okla. Sept. 22, 2014) (slip op.) (excluding testimony of expert because expert reached conclusions from largely undisputed facts and from traffic rules that are easily understood and within the common experience of jurors). And, since the City denies that Plaintiff was placed in leg shackles, it is particularly important for the jury to decide which version of the events to believe. *United States v. Toledo*, 985 F.2d 1462, 1470 (10th Cir. 1993) ("The credibility of witnesses is generally not an appropriate subject for expert testimony.").

### 4. *Double Locking*

In his fourth conclusion, McGrane opines that during the period Plaintiff was in the custody of the PTC, his handcuffs were not double locked and the failure to double lock the handcuffs caused Plaintiff's injuries. In his affidavit, McGrane states that "the cuffs were not double locked at some point after the initial arrest, because the plaintiff had no complaint with handcuffs during the time he was in custody by the initial arresting officer." (Resp. Ex. A ¶ 11.)

McGrane's affidavit also states that "[d]ouble locking is essential to prevent the types of injuries sustained by plaintiff, as determined and recorded by his doctors in his medical records furnished to me." (*Id.* ¶ 12.)

The City argues that these statements are opinions on factual matters, and the jury should determine whether Plaintiff's handcuffs were double locked; and if they were not double locked, whether the tight handcuffs caused Plaintiff's injuries. The Court agrees and will exclude McGrane's testimony that Plaintiff's handcuffs were not double locked. *Specht*, 853 F.2d at 808; *Vondrak*, 2009 WL 3241555, * 16. McGrane's basis for concluding that the handcuffs placed on Plaintiff by the PTC desk personnel were not double locked is Plaintiff's failure to complain about tight handcuffs prior to that time. The jury is capable of concluding from the testimony of Plaintiff and other lay witnesses whether or not Plaintiff's handcuffs were double locked. *See Vondrak*, 2009 WL 3241555, * 12 (excluding expert's opinion about whether handcuffs were double locked because expert did not offer a reliable basis for opinion from review of audio/video evidence). Once the jury is informed of the necessity of double locking, the jury will be capable of determining whether tight handcuffs caused Plaintiff's injury without McGrane's opinion. *Vondrak*, 2009 WL 3241555, * 18 (excluding expert's opinion that the length of time plaintiff was in handcuffs was reasonable because it was a legal conclusion).

5. *Effect of Failure to Double Lock*

In the fifth conclusion of his report, McGrane opines hypothetically that when handcuffs are not double locked, "they have a natural tendency to tighten when the arrestee, who is normally in a sitting position, has his handcuffed wrists pressed between his own body and the back of the seat . . ." In his affidavit, McGrane opines that tight handcuffs can have the same effect as a tourniquet—"[j]ust as a tourniquet can cut off blood flow to an extremity, so can a

21

handcuff, which can result in injury." (Resp. Ex. A ¶ 11.) McGrane opines, from a review of Plaintiff's medical records and a Medic Wiki article on handcuff neuropathy, that the medical diagnosis was correct, i.e. "that plaintiff's injuries were the result of too tight handcuffs." (*Id.*) The City argues that McGrane is not qualified to present these conclusions because he has no medical training, he has never arrested anyone, he has no training in police tactics or use of force, and he has never worked at a jail. While McGrane's resume reveals no formal medical training, McGrane's affidavit reports that he has training in "lifesaving first aid measures." (Resp. Ex. A ¶ 11.) And McGrane was certified in arrest procedures and handcuff protocols. (Resp. Ex. A, McGrane Aff. ¶¶ 1-3.)

The Court concludes that, based on his resume and affidavit, McGrane is qualified to testify that handcuffs have a natural tendency to tighten when they are not double locked. In addition, McGrane may testify that through his experience he has learned that tight handcuffs work the same way a tourniquet works to stop blood flow and that tight handcuffs can cause injury. In addition, McGrane's testimony about the purpose and necessity of double locking handcuffs will be helpful to the jury because this is not a subject with which jurors are familiar. *Vondrak*, 2009 WL 3241555, ** 14-16 (admitting expert testimony that handcuffs placed on plaintiff at his arrest were set to the proper tightness as helpful to the jury). However, McGrane may not testify that Plaintiff's medical records correctly identify the cause of Plaintiff's injury based on what he learned through a Medic Wiki article about handcuff neuropathy. The testimony about the Medic Wiki article would be inadmissible hearsay. *United States v. Rodella*, No. 14 CR 2783, 2014 WL 6634310, * 31 (D.N.M. Nov. 19, 2014) (Browning, J.) (slip op) (noting that expert witness cannot be used as a conduit of hearsay). And, McGrane is not

qualified, despite his training in first aid, to comment on the diagnosis reflected in Plaintiff's medical records.

### 6. *Ignoring Plaintiff's Complaints*

In his sixth conclusion, McGrane opines that certain City personnel were "derelict in their duties and responsibilities" and "their inattention, whether willful or accidental, directly contributed to the injuries sustained by the Plaintiff." In his seventh conclusion, McGrane opines that "[n]o prisoner should be willfully or accidentally neglected to the point of suffering extreme physical discomfort while remaining in handcuffs for three or more hours." In his affidavit, McGrane generally opines that "the handcuffing protocols in this case were not complied with[.]" (Resp. Ex. A ¶ 8.)

The City maintains that McGrane is not qualified to present opinions on how detainees should be treated. The City further asserts that these conclusions use legal terms of art without explaining those terms or giving the jury an opportunity to draw its own inferences. *See, e.g., United States v. Simpson*, 7 F.3d 186, 188 (10th Cir. 1993) (upholding the exclusion of expert's testimony that transactions amounted to misapplication or concealment of funds in bank fraud case). Plaintiff contends McGrane's testimony that City personnel were derelict in their duties and that they did not follow handcuffing protocols is relevant to show that the PTC officers treated him with excessive force.

The Court believes that McGrane's conclusion that the PTC officers were derelict in their duties is relevant to show excessive force through the PTC's officers' neglect in addressing Plaintiff's complaints. The conclusion that no prisoner should be allowed to suffer as Plaintiff did may be relevant to show that the City's custom or policy of allowing PTC officers to decide whether to respond to handcuff complaints was generally inappropriate. The Tenth Circuit has

23

permitted expert testimony on whether departmental customs or policies comply with generally accepted practices when municipal liability is at stake. *Ortega*, 2013 WL 438579, *4 (citing *Allen*, 119 F.3d at 842-43) (allowing police procedures expert to testify that officers' use of force was not in compliance with modern police standards); *see also Brown v. Gray*, 227 F.3d 1278, 1287-90 (10th Cir. 2000) (noting that an expert's opinion on risk associated with failure to train police officers regarding police action while off shift was sufficient to support a finding that Denver's training of police officers was inadequate). Moreover, an expert's opinion on an ultimate issue is not necessarily grounds for excluding the testimony. *Allen*, 119 F.3d at 844 (approving of expert testimony that the city's lack of training caused its officers' use of excessive force). To reduce the possibility that the jury will be unduly influenced by McGrane's conclusions on these issues, the Court can give cautionary instructions to the jury. *Zuchel v. City and County of Denver*, 997 F.2d 730, 743 (10th Cir. 1993) (approving of district court's instruction to the jury that "what the law is with regard to the use of force will be contained in the instructions I give you.").

In this case the jury will have to decide whether one of more of the PTC officers improperly handcuffed Plaintiff's wrists, whether the improper handcuffing caused Plaintiff's injury, and whether a City policy or custom was the reason for the officers' actions.[5] McGrane's opinion that the PTC officers were derelict in their duty to ensure Plaintiff's handcuffs were double locked and that the PTC officers' inattentiveness to Plaintiff's complaints caused Plaintiff's injuries is relevant to those issues. McGrane will also be allowed to opine that nationally accepted handcuff protocols were not followed. The jury will be informed of the

---

[5] If the Plaintiff presents evidence that the City's training or supervision of PTC officers was inadequate, Plaintiff will also have to prove that the City was deliberately indifferent to the risk associated with its lack of training or supervision. This issue, however, does not appear to be addressed in McGrane's opinion report or affidavit.

relevant legal standard by means of the Court's jury instructions. And, if requested, the Court will give a limiting instruction during McGrane's testimony.

## IV. CONCLUSION

Ultimately, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee note. "The court's 'gatekeeping' role favors admissibility of expert testimony when it is reliable and relevant . . ." *Hertz v. Luzenac America, Inc.,* No. 04 CV 1961, 2011 WL 1480523, *4 (D. Colo. April 19, 2011) (unpublished). "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. . . . Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Fed. R. Evid. 702 advisory committee note.

The Court finds that McGrane is qualified by training and experience to present his hypothetical testimony that handcuffs will tighten and injure a person's wrists if not double locked. Most jurors have no experience with handcuffs, and McGrane's explanation will help the jury. However, McGrane may not testify that PTC officers failed to double lock Plaintiff's handcuffs because McGrane has no basis for this opinion other than Plaintiff's injury and lack of prior complaint. Once the jury is informed about double locking and the effect of tight handcuffs, the jury can determine whether the PTC officers failed to double lock or improperly tightened Plaintiff's handcuffs. McGrane may also testify that the PTC officers' neglect of Plaintiff's complaints violated handcuff protocols. However, McGrane's testimony about the accuracy of the conclusions in Plaintiff's medical records is inadmissible.

IT IS ORDERED that DEFENDANT'S DAUBERT MOTION, AND MEMORANDUM

IN SUPPORT, REQUESTING TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT

THOMAS MCGRANE (Doc. No. 59) is granted in part and denied in part, as set forth above.

_____

SENIOR UNITED STATES DISTRICT JUDGE